1   Rodeen Talebi (CA SBN 320392)
    talebi@fr.com
2   FISH & RICHARDSON P.C.
    633 West Fifth Street, 26th Floor
3   Los Angeles, CA 90071
    Telephone: (213) 533-4240
4   Facsimile: (858) 678-5099

5   Neil J. McNabnay, *pending pro hac vice*
    mcnabnay@fr.com
6   Ricardo J. Bonilla, *pending pro hac vice*
    rbonilla@fr.com
7   Aaron P. Pirouznia, *pending pro hac vice*
    pirouznia@fr.com
8   FISH & RICHARDSON, P.C.
    1717 Main Street, Suite 5000
9   Dallas, Texas 75201
    Telephone: (214) 747-5070
10  Facsimile: (214) 747-2091

11  COUNSEL FOR PLAINTIFFS
    PAEDAE, INC. d/b/a GIMBAL
12

13              **IN THE UNITED STATES DISTRICT COURT**
                **SOUTHERN DISTRICT OF CALIFORNIA**
14                    **SAN DIEGO DIVISION**

15
    PAEDAE, INC. d/b/a GIMBAL,
16  GIMBAL, INC.,
                                        Case No.  **'23 CV 0335 L    DEB**
17              Plaintiffs,
                                        **PLAINTIFFS' ORIGINAL COMPLAINT**
18          v.
                                        JURY TRIAL DEMANDED
19  CUEBIQ, INC.,

20              Defendant.

21

22

23

24

25

26

27

28

Plaintiffs PaeDae, Inc. d/b/a Gimbal and Gimbal, Inc. (collectively, "Gimbal") for their Complaint against Defendant Cuebiq, Inc. ("Cuebiq"), hereby alleges as follows:

## PARTIES

1.     PaeDae, Inc. ("PaeDae") is a corporation organized and existing under the laws of Delaware with its principal place of business at 853 Broadway, 21st Floor, New York, New York 10003.

2.     Gimbal, Inc. is a corporation organized and existing under the laws of Delaware with its principal place of business at 853 Broadway, 21st Floor, New York, New York 10003. Gimbal, Inc. was created when Qualcomm Inc. spun off Qualcomm Retail Solutions, Inc. as an independent, standalone company. Gimbal, Inc. is now a wholly owned subsidiary of PaeDae, Inc.

3.     On information and belief, Cuebiq is a Delaware corporation with its principal place of business at 45 W. 27th Street, 3rd Floor, New York, New York 10001, and may be served through its agent, Corporation Service Company, at 251 Little Falls Drive, Wilmington, Delaware 19808.

## JURISDICTION AND VENUE

4.     Gimbal's federal claim for trade secret misappropriation arises under the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.* Accordingly, this Court has subject matter jurisdiction under 28 U.S.C. § 1331.

5.     The Court has supplemental jurisdiction over Gimbal's remaining claims under 28 U.S.C. § 1367 because those claims are so related to claims in the action within the Court's original jurisdiction such that they form part of the same case or controversy.

6.     Cuebiq is registered to do business in California and maintains an office at 44 Montgomery St., 4th Floor, San Francisco, California 94104. Thus, this Court has personal jurisdiction over Cuebiq because Cuebiq has established minimum contacts with the State of California such that the exercise of personal jurisdiction over Cuebiq will not offend the traditional notions of fair play and substantial justice.

1

7.     With respect to Gimbal's claim for breach of contract, Cuebiq subjected itself to the Gimbal Developer Agreement, and in doing so, consented to the exclusive jurisdiction of the courts of San Diego, California for resolution of the disputes alleged herein.

8.     Venue is proper under 28 U.S.C. §§ 1391 because Cuebiq subjected itself to the Gimbal Developer Agreement, and in doing so, consented to the exclusive venue of the courts of San Diego, California for resolution of the disputes alleged herein. Venue is also proper because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district and a substantial part of property that is the subject of the action is situated in this judicial district.

## BACKGROUND

### Gimbal

9.     On information and belief, Qualcomm Inc. invested more than $40 million between approximately 2011 and 2014 to develop a series of location intelligence IP, software, and technologies.

10.    On May 1, 2014, Qualcomm Inc. announced it was spinning off its location intelligence IP, software, and technologies, which Qualcomm Inc. called Gimbal. In a press release, Qualcomm Inc. stated that "third-party investors have established Qualcomm Retail Solutions, an existing subsidiary of Qualcomm, as an independent, standalone company. The third-party investors will collectively have a controlling interest in the business, but Qualcomm will remain a 'substantial' investor. The QRS unit will be renamed 'Gimbal, Inc.'"

11.    The business model of Gimbal is to build location intelligence IP, software, tools, and other technologies, which collectively constitute the "Gimbal Technology" or "Gimbal Solution," and then license the Gimbal Technology to customers. In exchange for use of the Gimbal Technology, customers pay a license fee to Gimbal.

### Beintoo

12.    On information and belief, Beintoo, Inc. ("Beintoo") was formed as a Delaware corporation that offered a community where users could discover mobile applications.

13.    On or about January 30, 2011, Beintoo.com described the company as: "a fast-growing community of apps passionate [*sic*] who want to share their apps experience with friends

and discover people with the same interests and close to the them. Come and join Beintoo, you will show to other users how good you are at discovering new apps and at playing with them. You will increase your Bescore level from 'Novice' up to 'Master' and you will get our virtual currency, the Bedollars, as reward! But we go further: our Bedollars allow you to get exceptional virtual goods as great prizes within your apps and you can convert them into coupons for real goods by visiting our sponsors stores in your town or on the Web. Transform your apps passion into real benefits."

14.    On information and belief, Beintoo did not have experience developing location intelligence technology from its founding until at least 2014.

### Beintoo Licenses the Gimbal Technology

15.    On January 21, 2014, Qualcomm Inc. and Beintoo entered into a Mutual Non-Disclosure Agreement to evaluate the use of the Gimbal Technology for use in Beintoo's solution.

16.    On or about March 26, 2014, Beintoo entered into the "Gimbal Developer Agreement" with Gimbal.

17.    Under the Gimbal Developer Agreement, "Solution" (*i.e.*, the Gimbal Technology or Gimbal Solution) was defined as "the products and services made available under this Agreement by QRS comprised of (i) the Software, (ii) Documentation, (iii) APIs, (iv) access to the Gimbal Manager, (v) related services provided by QRS, and (vi) Devices, if any."

18.    Under the Gimbal Developer Agreement, "Software" was defined as "(i) the licensed software under this Agreement including, without limitation: the software development kit(s) for the Features; related libraries and headers (i.e., Product Binaries); certain sample application(s) in human readable (source code) form or binary form (each a '**Sample Application'**), and (ii) Additional Software, if any, that QRS provides pursuant to Section 1.1 (Additional Software). The contents of the Software may vary by Feature and for platform specific versions."

19.    Under the Gimbal Developer Agreement, "Feature" was defined as "certain functionality that may be enabled by the Software (e.g., Gimbal Communicate, Gimbal Geofence, Gimbal Interest-Sensing and Gimbal Proximity)."

20.     Under the Gimbal Developer Agreement, "Documentation" was defined as "documentation that QRS provides or otherwise makes available to You in connection with the Solution."

21.     Under the Gimbal Developer Agreement, "APIs" were defined as "an application programming interface that QRS provides or otherwise makes available to You in connection with the Software and/or services provided hereunder."

22.     Under the Gimbal Developer Agreement, the "Gimbal Manager" was defined as "the web-based service made available by QRS to enable You to set-up, and manage Your account and may provide You the ability to, among other things, establish Fences, manage communications and Fence events and Devices, and test, manage and generate data points and in some cases analytics and reports (such data points, analytics and reports hereinafter collectively referred to as "**Analytics**") with respect to Your Applications."

23.     Under the Gimbal Developer Agreement, "Application" was defined as "each software application You develop, or have developed on Your behalf by Your Contractor(s), with or in connection with the Software, which application is intended to be distributed for download and/or installation by end users for use on electronic devices."

24.     Under the Gimbal Developer Agreement, "Device" was defined as "any hardware device that may be licensed by QRS to You or otherwise made available to You by QRS in relation to any Feature (e.g., Beacons). For the avoidance of doubt, 'Device' expressly excludes Hubs and Receivers."

25.     Under the Gimbal Developer Agreement, Beintoo agreed that "[e]xcept as expressly permitted in Section 2 ['License Grants'], [Beintoo] shall not, and shall ensure that [Beintoo's] Contractors do not reproduce, distribute, publicly perform, publicly display or create derivative works of or based on the Software, or disclose, rent, lease, loan, provide or otherwise transfer, in any manner, to any third party the Software, Documentation or any portion thereof."

26.     Under the Gimbal Developer Agreement, Beintoo agreed that "[e]xcepting any portions of the Software provided to [Beintoo] in source code format, and excepting any third party code distributed with the Software that is licensed under contrary terms, [Beintoo] will not

reverse engineer, disassemble, decompile, or translate the Software or any portion thereof, or otherwise attempt to derive the source code version of the Software, except if and to the extent expressly permitted under any applicable law. If applicable law expressly permits such activities, any information so discovered or derived shall be deemed to be the confidential proprietary information of [Gimbal] and must be promptly disclosed by [Beintoo] to [Gimbal]."

27.     Under the Gimbal Developer Agreement, Beintoo agreed that "[Beintoo] will not, and shall ensure that [Beintoo's] Contractors do not access or use for any purpose any API other than such APIs as are expressly described in the Documentation."

28.     Under the Gimbal Developer Agreement, Beintoo agreed that "[Beintoo] will not, and shall ensure that [Beintoo's] Contractors do not use the Software to create or develop any developer tools (including without limitation plug-ins and middleware) or any software other than end-user targeted Applications."

29.     Under the Gimbal Developer Agreement, Beintoo agreed that "[Beintoo] will not, and shall ensure that [Beintoo's] Contractors do not use any part of the Solution to do anything which degrades or otherwise negatively impacts QRS's product or services."

30.     Under the Gimbal Developer Agreement, Beintoo agreed that it would not "reverse engineer or access the Gimbal Manager in order to (i) build a competitive product or service, (ii) build a product using similar ideas, features, or functions of the Gimbal Manager, (iii) copy any ideas, features, or functions of the Gimbal Manager, or (iv) transfer any Solution Data . . . to any third party in exchange for a fee or any other benefit."

31.     Under the Gimbal Developer Agreement, Beintoo agreed to the Gimbal Fee Schedule that, among other things, obligated Beintoo to pay a service fee of $0.04 to $0.06 per monthly active user depending on the number of Beintoo users active users during a calendar month.

32.     The Gimbal Developer Agreement requires, among other things, written notice to Gimbal if a party wishes to terminate the agreement.

33.     Beintoo did not provide Gimbal with written notice of termination of the Gimbal Developer Agreement.

34.     The Gimbal Developer Agreement between Gimbal and Beintoo is still in effect.

35.     On March 26, 2014, Gimbal and Beintoo executed the "Amendment to Gimbal Developer Agreement," which, among other things, required Beintoo to pay Gimbal Public Network fees of $0.50 per thousand Visits after a three-month free trial term.

36.     The Amendment to Gimbal Developer Agreement requires, among other things, written notice to Gimbal if Beintoo wishes to terminate the agreement.

37.     Beintoo did not provide Gimbal with written notice of termination of the Amendment to Gimbal Developer Agreement.

38.     The Amendment to Gimbal Developer Agreement is still in effect.

39.     On September 19, 2014, Gimbal and Beintoo executed the "Addendum to Gimbal and Beintoo Amendment," establishing an "Advertising SDK Pilot" that uses Gimbal technology to allow Beintoo to deliver "retailer's and brand's targeted content, offers and advertisements."

40.     The Advertising SDK Pilot period began on March 26, 2014, and expired on December 31, 2014.

41.     The Gimbal Developer Agreement, Amendment to Gimbal Developer Agreement, and Addendum to Gimbal and Beintoo Amendment collectively constitute the "License Agreement."

**Beintoo Uses and Tests the Gimbal Technology**

42.     Throughout 2014, Beintoo continued to test and/or use the Gimbal Technology. Gimbal shared its trade secrets and intellectual property and gave access to its systems and technology based on the expected payment of the agreed-upon license fee.

43.     Beintoo was a prolific user of the Gimbal Technology, using and testing many of the systems, including Gimbal Manager, Gimbal's Location SDK, and Bluetooth beacons. Beintoo created over 40,395 "places" using the Gimbal Technology. For comparison purposes, the Gimbal internal test account only had 5,353 "places" created, and the "Qualcomm Corporate Product Test" account had just 7,292 "places" created.

44.     On October 7, 2014, the Wall Street Journal reported "Beintoo, a Gimbal partner, used the phone-based network to send out coupons from retailers including Barnes & Noble."

45.     Beintoo's then-CTO made a Production API key request to use the Gimbal Technology in an application called "BeAudience," which he described as "Building audiences for better experience." The CTO requested the Production API key on behalf of Beintoo, Inc., for which he provided an address of 1441 Broadway 10018 New York, New York and country of registration as the United States. On information and belief, the CTO was also a Founder of Beintoo.

### Beintoo Publicly Launches "BeAudience" Using the Gimbal Technology

46.     On November 12, 2014, Beintoo issued a press release stating that "Beintoo, a mobile technology company that creates disruptive online to offline engagement campaigns for brands and retailers, and Gimbal, Inc., the leader in location and proximity-based mobile engagement, with the world's largest deployment of dedicated Bluetooth Smart beacons, announced today a partnership to deliver a proximity-based programmatic audience platform. The partnership combines Gimbal's industry-leading proximity engagement platform, including beacon technology and analytics capabilities, with Beintoo's mobile marketing expertise to offer advertisers a powerful means of consumer engagement that capitalizes on opted-in users' real-world shopping history. Because advertisers' content is matched closely with interests and past shopping behavior, users receive content that is contextual, relevant and offers a clear call to action."

47.     That same month, the CEO of Beintoo gave a technical talk at an event hosted by Gimbal and Hakka Labs titled "The NYC Master Class – Beacons and Geolocation." A recording of the talk can be found at https://www.youtube.com/watch?v=aCOmiY7888o. Beintoo's CEO stated that Beintoo was unveiling a new product, "BeAudience," using the Gimbal Technology, with an SDK for developers and a platform for agencies and brands that was to be rolled out that day in beta mode.

48.     Beintoo's CEO stated in the November 12, 2014 announcement that "Beintoo is focused on building a programmatic platform for brick-and-mortar retailers, brands, and agencies, in order to drive in-store foot traffic and offline transactions." Beintoo's CEO was also quoted as saying that "[i]ncorporating the Gimbal platform into the mobile BeAudience platform offers

7

1    brands and retailers the perfect opportunity to engage consumers with relevant advertising content

2    that matches their real shopping intent when and where it matters to them."

3        49.    The BeAudience platform is middleware, not an end-user targeted application, and

4    is subject to the License Agreement.

5        50.    The Amendment to the Gimbal Developer Agreement defines "Visits" as "the

6    events a publisher can choose to receive as a result of their application, which incorporates the

7    Gimbal Platform, which means arriving, dwell time, and departing the proximity of a Device that

8    it can, and is authorized to, sight."

9        51.    Gimbal supported Beintoo and the launch of the BeAudience product because,

10    according to the License Agreement, Gimbal would receive, amongst other benefits, $0.50 for

11    every thousand "Visits," and a service fee of $0.04 to $0.06 per monthly active user. If successful,

12    this would be a significant source of revenue for Gimbal.

13        52.    On February 25, 2015, Beintoo sent an email to a potential customer describing

14    BeAudience as "the first mobile data driven platform that segments anonymously users into

15    audiences of interests and the first one interacting with beacon networks."

16        53.    In that same email, Beintoo shared that it was "rolling out a geo-behavioural data

17    product: BeAudience"—a reference to the product based on and developed using the Gimbal

18    Technology. Beintoo went on to say that "BeAudience is the first mobile data driven platform that

19    segments anonymously users into audiences of interests and the first one interacting with beacon

20    networks; Thanks to our SDK, we cluster users by the mean of an index that takes into account:

21    proximity, beacon signals, dwell time and frequency in a specific venue."

22        54.    On February 27, 2015, Beintoo issued a press release on Business Wire where it

23    described BeAudience as "a platform that gathers location data directly from users' devices via a

24    simple SDK, and is compatible with any proximity solution provider to capture signals from

25    beacons in its network. The solution can then analyze the historical location patterns of

26    anonymized app users who have opted in through BeAudience-powered mobile apps and segment

27    them accordingly." In the press release, Beintoo now described itself as "a mobile technology

28    company that enables disruptive online-to-offline engagement campaigns for brands and retailers,

8

to leverage data from user 'dwell-time' within beacon signals and geofences to segment highly targeted audiences for mobile ad campaigns." This description matches the Gimbal Technology that Beintoo had access to and was actively licensing from Gimbal.

55.     On September 14, 2015, Beintoo posted a video from its YouTube account describing BeAudience as a "geo-behavioral data" product that "enables relevant, personalized marketing based on the points of interest where users actually spend time in the physical world." Beintoo stated that "with a few lines of code, BeAudience is able to automatically process beacon, Wi-Fi, and GPS signals received by the devices of app users." This video can be found at https://www.youtube.com/watch?v=Ha_Gag433CE.

56.     Despite launching and marketing the BeAudience product, which "incorporat[ed] the Gimbal platform," Beintoo's CEO told Gimbal that "there was no commercial launch" when asked why Beintoo never paid Gimbal any licensing fees. According to Beintoo's CEO, Beintoo never received revenues from using the Gimbal Technology, so there was no license fee due from Beintoo to Gimbal.

57.     On information and belief, based on recently uncovered information, those statements were false.

58.     Beintoo's misrepresentations and concealment of facts prevented Gimbal from discovering that Beintoo did in fact have a "commercial launch" as early as Q3 2015, which would have required payment of licensing fees under the License Agreement.

59.     Gimbal relied to its detriment on Beintoo's misrepresentations that Beintoo had not done a "commercial launch" and on Beintoo's concealment of Beintoo's commercial launch in Q3 2015.

**Beintoo Launches Cuebiq**

60.     On or about February 18, 2016, Beintoo announced that it "launched" Cuebiq, "a next generation business intelligence (BI) company that helps businesses understand consumers' offline behavior and purchase intent." Beintoo's CEO was appointed CEO of Cuebiq. The press release went on to state that "Cuebiq offers a suite of products that give businesses a holistic view of a consumer's offline geo-behavior " The suite included "VisitQ, a new footfall attribution

9

dashboard that provides access to campaign report data in an interactive and dynamic way" and "AudienceQ, which collects smart data from users to create audience segments." AudienceQ would have been the Cuebiq branded version of the BeAudience technology.

61.    On or around June 30, 2016, after the public launch of Cuebiq, a Gimbal Vice President and a Senior Director of Business Development approached the CEO of Cuebiq and asked him whether Cuebiq was using the Gimbal Technology under the terms of the parties' agreements or otherwise.

62.    Cuebiq's CEO assured them that Cuebiq was not using the Gimbal Technology.

63.    On information and belief, based on recently uncovered information, Cuebiq's CEO's representations were false.

64.    Gimbal relied to its detriment on Cuebiq's CEO's representation that Cuebiq did not use the Gimbal Technology.

**PaeDae, Inc. Acquires Gimbal, Inc.**

65.    On November 29, 2016, PaeDae, Inc. acquired Gimbal, Inc., which remains a wholly owned subsidiary, and PaeDae, Inc. began doing business as "Gimbal."

66.    In 2017, when PaeDae asked the Gimbal executives who had worked with the CEO of Beintoo and Cuebiq about Cuebiq, PaeDae was informed of the Beintoo/Cuebiq CEO's statements that Beintoo did not commercially launch its product and that Cuebiq was not using the Gimbal Technology.

67.    On information and belief, based on recently uncovered information, those representations were false.

68.    PaeDae relied to its detriment on the representation to Gimbal that Beintoo never commercially launched its product and that Cuebiq did not use the Gimbal Technology.

**Cuebiq Attempts to Sell the Gimbal Technology**

69.    On October 11, 2020, Cuebiq's CEO participated in a call with PaeDae's then-CEO and Head of Corporate Development. On that call, Cuebiq's CEO indicated that Cuebiq was evaluating a sale of the part of its business named "Clara" that was serving adtech customers with audience and measurement products. On information and belief, Clara included the AudienceQ

and VisitQ products, both of which used the Gimbal Technology. Cuebiq's CEO explained that after divestiture of Clara, Cuebiq would focus on its geospatial-focused data cleanroom product— "Workbench." This and related discussions were ultimately unfruitful.

70.     In June 2021, Cuebiq's CEO reached out to PaeDae to restart a dialogue. On June 10, 2021, Cuebiq's CEO held a call with PaeDae's Head of Corporate Development in which Cuebiq's CEO again expressed a desire for divestiture of Clara, but in the form of a strategic partnership whereby PaeDae would sell and market the Clara technology for Cuebiq and Cuebiq would focus its efforts on Workbench.

71.     On September 1, 2021, Cuebiq's CEO informed PaeDae that Cuebiq had engaged the investment bank Progress Partners to explore a sale of Clara, which he intended to "spin out" to focus on launching a new business unit based on Workbench.

72.     Cuebiq and PaeDae executed a Mutual Nondisclosure Agreement on September 22, 2021. On September 28, 2021, Progress Partners provided PaeDae with a confidential information memorandum in connection with the sale of Clara and opened a data room to PaeDae.

73.     When the PaeDae team started due diligence and reviewed the previously unknown information in the data room, PaeDae learned that Cuebiq had used the Gimbal Technology or derivatives of the Gimbal Technology in creating the Clara technology that it was now offering to sell to PaeDae.

74.     On February 23, 2022, Cuebiq announced that it had launched "Spectus [which was] created by the leadership team at Cuebiq, including [the CEO of Beintoo and Cuebiq]." Spectus was described as the geospatial-focused data cleanroom offering, formerly known as Cuebiq Workbench.

**PaeDae Investigates and Seeks Explanation**

75.     During the course of its diligence on Cuebiq and the Clara technology, PaeDae discovered the still-in-force Licensing Agreement between Gimbal and Beintoo.

76.     During the course of its diligence on Cuebiq and the Clara technology, PaeDae discovered that Cuebiq was not in fact a spinout of Beintoo, but was actually the same company.

77.     In October 2021, PaeDae sent an email and informed Progress Partners and Cuebiq of its concerns over the apparent connection between Beintoo and Cuebiq, and thus about the potential misappropriation of the Gimbal Technology. PaeDae and Cuebiq had a positive working relationship up until this point, so PaeDae decided to give Cuebiq's CEO the chance to address the concerns rather than immediately taking legal action.

78.     In October 2021, PaeDae and Cuebiq also had a call where PaeDae expressed its concerns in more detail. Instead of addressing the concerns, Cuebiq's CEO denied that Beintoo and Cuebiq had any relationship and claimed that any or breach misappropriation was not the responsibility of Cuebiq but of Beintoo, a purportedly separate company based in Italy. The parties agreed that Cuebiq's CEO would address PaeDae's newly discovered concerns in writing.

79.     In response to PaeDae's concerns that Cuebiq has an existing and in-force licensing agreement with Gimbal, Cuebiq's CEO disclaimed responsibility and repeated his previous misrepresentations, writing "In August 2016 we completed a demerger of Cuebiq , which became a separate and independent company, with its own team and its own IP without any overlap with Beintoo… …The only overlap was represented by the fact that at the moment T0 of the demerger the two companies had the same captable, because that's how you do this kind of demergers to avoid issues with the shareholders." Cuebiq's CEO further stated that the License Agreement was "signed more than 7 years ago with a company that is different from Cuebiq."

80.     On information and belief, based on recently discovery information, Cuebiq's CEO's statements were false.

81.     Based on recently discovered information, Beintoo and Cuebiq did not have their "own team." By way of example, in 2021, Beintoo's former CTO described himself on his LinkedIn profile as both a Founder and CTO of Beintoo from September 2010 to March 2020 and a Founder and Chief Intelligence Officer of Cuebiq from November 2016 to the present.

82.     Based on recently discovered information, Beintoo's former CTO continued to access Gimbal Manager through his Beintoo login credentials including after the launch of Cuebiq.

83.    On information and belief, based on recently discovered information, Beintoo rebranded as Cuebiq, but they are the same legal entity.

84.    In response to PaeDae's concerns that Beintoo had misappropriated the Gimbal Technology and breached the License Agreement, Cuebiq's CEO admitted in writing that Beintoo used the Gimbal Technology with the BeClub app—a predecessor to the BeAudience app—but he claimed that the BeClub app was an "epic failure" that did not make any money. Cuebiq's CEO then tried to disclaim responsibility, stating that "[d]uring the course of 2015 we actually decided to pursue a completely different approach compared to the Gimbal platform," a fact belied by his previous public statements that the BeAudience product was integrated with and used the Gimbal Technology. Cuebiq's CEO further stated that "[t]he integration with the Gimbal beacon technology and beacon network was never completed and never went live," and instead, his team developed the Cuebiq location intelligence technology "from scratch."

85.    Based on recently discovered information, Cuebiq's CEO's statements were false, and Cuebiq is in breach of the License Agreement, which is still in force.

## PaeDae Discovers Further Evidence of Breach

86.    After Cuebiq's CEO attempted to disclaim responsibility, PaeDae investigated Cuebiq's prior public statements, and these statements support the recent discovery that (1) Beintoo did commercially launch location intelligence products that used the Gimbal Technology, (2) Cuebiq's products were "born out of" Beintoo's products and use or used the Gimbal Technology or derivatives of the Gimbal Technology, and (3) Cuebiq and Beintoo are the same legal entity.

87.    Based on recently discovered information, on or about December 22, 2017, Cuebiq's CEO was interviewed by Disruptor Daily. Cuebiq's CEO was quoted as saying: "**Cuebiq was born out of my previous company, Beintoo**, a leading European mobile user acquisition and retention company. **During my time as Beintoo's CEO, we started testing the potential of location intelligence and found not only a growing interest in the marketplace but also how location data could finally help bridge the gap between consumers' online and offline behaviors. This ultimately led to the creation of Cuebiq in February of 2016**, which is

now a leading location intelligence company with the largest, most accurate location database in the world, reaching 2 in 5 anonymous smartphone users worldwide."[1]

88.    On information and belief, based on recently discovered information, Cuebiq was not a separate company without ties to Beintoo, but in fact a part of the same corporate entity.

89.    On information and belief, based on recently discovered information, within months of having access to Gimbal's confidential and proprietary technology and trade secrets, at a time when Beintoo had little to no prior experience with location intelligence IP, software, or technology and little to no capital investment, it began to market and sell a geo-location SDK that Cuebiq's CEO already publicly stated used the Gimbal Technology. On information and belief, based on recently discovered information, Beintoo did so without first expending the considerable resources and time it took to develop the underlying Gimbal Technology.

90.    On information and belief, based on a recently discovered information, despite having falsely informed Gimbal that "there was no commercial launch" and thus no revenue in Q3 2015, Beintoo began to sell a location intelligence product that used the Gimbal Technology. Indeed, based on recently discovered information, Beintoo stated in 2016 that it had location intelligence product revenue in Q4 2015 and that it had millions of dollars of minimum guaranteed recurring revenue signed between November 2015 and April 2016, and millions more in negotiation.

91.    In 2015, Beintoo avoided paying Gimbal the agreed-upon license fee and concealed its breach of the License Agreements by falsely stating it had not "commercial[ly] launch[ed]" and thus had no revenue for its location intelligence products that used the Gimbal Technology. Yet, based on recently discovered information, Beintoo had in fact commercially launched its location intelligence products at least as far back as Q3 2015 and then publicly launched those same products or similar products (all of which used the licensed Gimbal technology or derivatives of the Gimbal Technology) under the name "Cuebiq" in Q1 2016. By the time Gimbal learned of the competing Cuebiq location intelligence products in Q2 2016, almost a year had passed, and

---

[1] Emphasis added.

Gimbal reasonably relied on Cuebiq's CEO's assertions that Cuebiq did not use the Gimbal Technology.

92.    Based on Beintoo's concealment of the "commercial launch" of its location intelligence products from Gimbal, then changing the name under which its location intelligence products were offered from Beintoo to Cuebiq, Cuebiq's CEO was able to avoid the suspicion of a breach of the License Agreement. When Gimbal executives inquired with Cuebiq's CEO in Q2 2016, he stated that Cuebiq had not used the Gimbal Technology. Given the circumstances, Gimbal reasonably relied on Cuebiq's CEO's concealment and false statements.

93.    Had Gimbal known the truth and had Cuebiq's CEO not made false and misleading statements and concealed the breach of the License Agreements, Gimbal would have demanded payment of the license fees.

94.    On information and belief, based on recently discovered information, Cuebiq's current products incorporate the Gimbal Technology or derivatives of the Gimbal Technology.

95.    On information and belief, based on recently discovered information, Cuebiq reverse engineered the Gimbal Technology.

96.    On information and belief, based on recently discovered information, Cuebiq created derivative works based on the Gimbal Technology.

97.    On information and belief, based on recently discovered information, Cuebiq used the Gimbal Technology to create or develop developer tools or software other than end-user targeted applications.

98.    On information and belief, based on recently discovered information, Cuebiq reverse engineered or accessed Gimbal Manager in order to build a competitive product or service.

99.    On information and belief, based on recently discovered information, Cuebiq reverse engineered or accessed Gimbal Manager in order to build a product using similar ideas, features, or functions as Gimbal Manager.

100.    On information and belief, based on recently discovered information, Cuebiq reverse engineered or accessed the Gimbal Manager in order to copy ideas, features, or functions of the Gimbal Manager.

101.    On information and belief, based on recently discovered information, Cuebiq reverse engineered or accessed the Gimbal Location SDK in order to build a competitive product or service.

102.    On information and belief, based on recently discovered information, Cuebiq reverse engineered or accessed the Gimbal Location SDK in order to build a product using similar ideas, features, or functions as the Gimbal Location SDK.

103.    On information and belief, based on recently discovered information, Cuebiq reverse engineered or accessed the Gimbal Location SDK in order to copy ideas, features, or functions of the Gimbal Location SDK.

104.    Based on the recent discovery that Beintoo and Cuebiq are the same legal entity, Cuebiq is still obligated to pay Gimbal $0.50 for per thousand Visits, $0.04 per monthly active user, and late payment charges on the unpaid amount at the rate of one and one half percent (1.5%) per month or the maximum rate permitted under applicable law, whichever is less, pursuant to the License Agreement.

105.    Gimbal has never received payment from Beintoo or Cuebiq under the License Agreement.

106.    Cuebiq, inclusive of the time it was doing business as Beintoo, has breached the License Agreement.

107.    Cuebiq, inclusive of the time it was doing business as Beintoo, made repeated misrepresentations that prevented Gimbal from discovering that Beintoo and Cuebiq are the same legal entity and that Cuebiq is thus subject to the License Agreement.

108.    Cuebiq, inclusive of the time it was doing business as Beintoo, made repeated misrepresentations that further prevented Gimbal from discovering that Beintoo and Cuebiq were using the licensed Gimbal technology or derivatives of the Gimbal Technology.

109.    Gimbal relied to its detriment on Cuebiq's CEO's representations that Beintoo never commercially launched location intelligence products, that Cuebiq did not use the Gimbal Technology, that Beintoo and Cuebiq were separate and independent companies, and that Cuebiq was not subject to the License Agreement.

16

110.    Cuebiq's repeated misrepresentations prevented Gimbal, Inc. and PaeDae from discovering this information at an earlier time.

### PaeDae Seeks a Productive, Out-of-Court Resolution

111.    On November 12, 2021, with an overwhelming amount of evidence pointing to Cuebiq's breach, concealment, and false and misleading statements, PaeDae asked Cuebiq to mediate this dispute. Initially, Cuebiq refused.

112.    Cuebiq proposed to have a neutral third party determine whether Cuebiq was using Gimbal's trade secrets, but Cuebiq reneged on that proposal in favor of limited review of the validity of Cuebiq's patent, U.S. Patent No. 10,966,049 titled "Systems and Methods to Collect Location Data by Using a Dynamic Geofencing Methodology." PaeDae refused this offer because the validity of Cuebiq's patent is irrelevant to this dispute, as Cuebiq filed for the patent on December 29, 2016—well after it should have been paying a license fee to Gimbal for use of its technology.

113.    PaeDae then shared a draft complaint it intended to file if Cuebiq continued to refuse mediation.

114.    On April 18, 2022, in an effort to find an out-of-court solution, PaeDae and Cuebiq entered into a Standstill and Tolling Agreement, whereby the parties would engage in confidential mediation discussions.

115.    Under the Standstill and Tolling Agreement, Cuebiq agreed that a future action against Cuebiq "related to misappropriation of trade secrets, breach of any prior contract between the Parties, or any related claim" would have an effective filing date of April 18, 2022.

116.    On May 4, 2022, Cuebiq abruptly and unilaterally terminated the Standstill and Tolling Agreement, which terminated the confidentiality obligations.

117.    On or about June 2022, PaeDae's then-Executive Chairman ran into Cuebiq's Chairman at an in-person industry conference. The two talked briefly, and PaeDae's then-Executive Chairman stated that he hoped Cuebiq would restart settlement discussions.

118. After waiting approximately 4 months without a reply, on November 1, 2022, PaeDae's then-Executive Chairman emailed Cuebiq's Chairman and asked that Cuebiq and Gimbal resume settlement discussions. Cuebiq's Chairman did not reply.

119. PaeDae's then-Executive Chairman again emailed Cuebiq's Chairman on November 20, 2022, and copied Cuebiq's (now former) CEO in his communication. Neither replied.

**COUNT I**
**VIOLATION OF THE DEFEND TRADE SECRETS ACT**

120. Gimbal incorporates the above paragraphs by reference.

121. This claim arises under the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C § 1836, which prohibits the misappropriation of trade secrets.

122. Gimbal possesses confidential and trade secret information, including but not limited to, its software, hardware, research, designs, specifications, code, algorithms, data, techniques, processes, and all related information.

123. Gimbal offers, sells, and uses its trade secrets in interstate commerce.

124. Gimbal made reasonable efforts to maintain the secrecy of this information, such as by limiting its disclosure to those who, like Cuebiq, had confidentiality obligations.

125. Gimbal expended substantial time, labor, skill, research and development, and capital to develop its trade secrets, which are extremely valuable to Gimbal and give them a competitive advantage. Gimbal's trade secrets are not generally known in the industry and cannot be easily acquired or duplicated by others.

126. Beintoo, Cuebiq's predecessor-in-interest, executed the January 21, 2014, Mutual Non-Disclosure Agreement, which stated that Qualcomm Incorporated (Gimbal, Inc.'s then-parent) "possesses confidential, proprietary, and/or trade secret information" and that Cuebiq would hold that information "in strict confidence" and would use such information only for the purpose of evaluating the possibility of forming a joint business relationship and potentially furthering the purpose and intent of any resulting written agreement.

127.    Beintoo, Cuebiq's predecessor-in-interest, executed the Gimbal Developer Agreement, which stated that the "Solution, including without limitation the Software, Documentation and Gimbal Manager, Solution Data, Analytics, and all related information, are confidential and proprietary to QRS."

128.    Cuebiq had an obligation to maintain the confidentiality of Gimbal's trade secrets.

129.    In reliance on the trust and confidence stemming from the execution of the Mutual Non-Disclosure Agreement and the Gimbal Developer Agreement, Gimbal provided Beintoo, Cuebiq's predecessor-in-interest, with its trade secrets.

130.    On information and belief, based on recently discovered information, Cuebiq knowingly and improperly designed and marketed its products with the benefit of Gimbal's trade secrets.

131.    On information and belief, Cuebiq knew or should have known that Gimbal's trade secrets were improperly used to design and market Cuebiq's products.

132.    On information and belief, based on recently discovered information, Cuebiq misappropriated Gimbal's trade secrets, yet kept the secrets confidential while using them to its own commercial advantage.

133.    On information and belief, Cuebiq's conduct constitutes knowing, willful, gross, and/or wanton misappropriation.

134.    On information and belief, by misappropriating Gimbal's trade secrets, Cuebiq obtained immediate, direct, and substantial commercial benefits, including but not limited to financial benefits from a shortened time to market, substantially reduced development costs, and sales of its products, as well as gaining a competitive advantage.

135.    As a result of Cuebiq's misappropriation, Gimbal has suffered direct and consequential damages, and is entitled to recover compensatory or actual damages, unjust enrichment damages, a reasonable royalty, attorneys' fees, punitive damages, and other damages in an amount to be proved at trial.

136.    Cuebiq's misappropriation has caused and is causing irreparable harm to Gimbal, for which Gimbal has no adequate remedy at law. Unless this Court restrains Cuebiq from

misappropriating Gimbal's trade secrets, the harm will continue in the future. Accordingly, Gimbal is entitled to preliminary and permanent injunctive relief.

137.    Gimbal seeks monetary damages and all other relief available.

138.    Cuebiq's repeated misrepresentations prevented Gimbal from discovering the information necessary to bring this cause of action at an earlier time.

## COUNT II
### VIOLATION OF THE CALIFORNIA UNIFORM TRADE SECRETS ACT

139.    Gimbal incorporates the above paragraphs by reference.

140.    Cuebiq's actions, as set forth herein, constitute misappropriation in violation of the California Uniform Trade Secrets Act, California Civil Code § 3426 *et seq.*

141.    Gimbal's trade secrets relate to a product or service used in, or intended for use in California as they are used in connection with Gimbal's products and services, which are developed, offered for sale, and used in California.

142.    Gimbal seeks monetary damages and all other relief available.

143.    Cuebiq's repeated misrepresentations prevented Gimbal from discovering the information necessary to bring this cause of action at an earlier time.

## COUNT III
### TRADE SECRET MISAPPROPRIATION UNDER NEW YORK COMMON LAW

144.    Gimbal incorporates the above paragraphs by reference.

145.    On information and belief, Cuebiq is and was headquartered in New York, New York during the relevant period and thus is subject to the laws of New York State.

146.    Cuebiq's actions, as set forth herein, constitute misappropriation under New York law.

147.    Gimbal's trade secrets relate to a product or service used in, or intended for use in New York as they are used in connection with Gimbal's products and services, which are offered for sale and used in New York.

148.    Gimbal seeks monetary damages and all other relief available.

149.    Cuebiq's repeated misrepresentations prevented Gimbal from discovering the information necessary to bring this cause of action at an earlier time.

## COUNT IV
## BREACH OF CONTRACT

150.    Gimbal incorporates the above paragraphs by reference.

151.    Gimbal and Cuebiq (f/k/a Beintoo) entered into the License Agreement.

152.    The License Agreement is "governed and interpreted in accordance with the laws of the state of California, United States of America, without giving effect to its conflict of laws provisions that would result in the application of the laws of a different state or country."

153.    Gimbal performed under the License Agreement and/or was excused from not performing because of Cuebiq's material breaches.

154.    Cuebiq breached the License Agreement when it failed to pay Gimbal under the License Agreement despite using the Gimbal Technology.

155.    Cuebiq breached the License Agreement when it created derivative works based on the Gimbal Technology.

156.    Cuebiq breached the License Agreement when it reverse engineered the Gimbal Technology.

157.    Cuebiq breached the License Agreement when it used the Gimbal Technology to create or develop developer tools or software other than end-user targeted applications.

158.    Cuebiq breached the License Agreement when it reverse engineered or accessed the Gimbal Manager in order to build a competitive product or service.

159.    Cuebiq breached the License Agreement when it reverse engineered or accessed the Gimbal Manager in order to build a product using similar ideas, features, or functions as the Gimbal Manager.

160.    Cuebiq breached the License Agreement when it reverse engineered or accessed the Gimbal Manager in order to copy ideas, features, or functions of the Gimbal Manager.

161.     Cuebiq breached the License Agreement in secret by, among other things, not disclosing that it used the Gimbal Technology or derivatives of the Gimbal Technology. The harm flowing from Cuebiq's breaches were not reasonably discovered by Gimbal until a future time.

162.     As a result of Cuebiq's breaches, Gimbal has suffered damages for which it is entitled to recovery.

163.     Gimbal seeks monetary damages and all other relief available.

164.     Cuebiq's repeated misrepresentations prevented Gimbal from discovering the information necessary to bring this cause of action at an earlier time.

## COUNT V
### FRAUD

165.     On or around June 30, 2016, Gimbal Vice President and Gimbal Senior Director of Business Development approached the former CEO of Beintoo and current CEO of Cuebiq and asked him whether Beintoo, now Cuebiq, was using the Gimbal Technology under the terms of the parties' agreements or otherwise.

166.     Cuebiq's CEO assured them that Cuebiq did not use the Gimbal Technology. Cuebiq's CEO was acting on behalf of Cuebiq as its CEO when he made this statement.

167.     On information and belief, Cuebiq's CEO's representation was knowingly false. Cuebiq's CEO's public statements demonstrate that, as CEO, he had in-depth knowledge of the technology used by Cuebiq. Cuebiq's CEO's false assurances could not have been inadvertent given the knowledge he possessed concerning Cuebiq's business.

168.     On information and belief, it was Cuebiq's CEO's intent for Gimbal to rely on this misrepresentation and not further investigate Cuebiq's use of the Gimbal Technology.

169.     Gimbal relied on Cuebiq's CEO's assurances to its detriment. Gimbal and Cuebiq had a cooperative relationship in which Gimbal was justified in relying on Cuebiq's representations as to how it used the Gimbal Technology.

170.     Had Cuebiq not mislead Gimbal, Gimbal would have known that Cuebiq had misappropriated Gimbal's trade secrets, used licensed Gimbal technology or derivatives of the Gimbal Technology, and breached the License Agreement.

171.    In 2021, Gimbal once again approached Cuebiq's CEO regarding the use of the Gimbal Technology. Cuebiq's CEO admitted that Beintoo used the Gimbal Technology with the BeClub app—a predecessor to the BeAudience app, but he claimed that the app was an "epic failure" that did not make any money. Cuebiq's CEO also claimed that "there was no commercial launch" of any product that used the Gimbal Technology and explained that "[d]uring the course of 2015 we actually decided to pursue a completely different approach compared to the Gimbal platform." Cuebiq's CEO further stated that "[t]he integration with the Gimbal beacon technology and beacon network was never completed and never went live," and instead, that Cuebiq developed its own technology "from scratch." Cuebiq's CEO was acting on behalf of Cuebiq as its CEO when he made these statements.

172.    In 2021, Gimbal also asked about the relationship between Beintoo and Cuebiq. Cuebiq's CEO stated, "In August 2016 we completed a demerger of Cuebiq, which became a separate and independent company, with its own team and its own IP without any overlap with Beintoo." Cuebiq's CEO further stated that the License Agreement was "signed more than 7 years ago with a company that is different from Cuebiq." Cuebiq's CEO was acting on behalf of Cuebiq as its CEO when he made these statements.

173.    On information and belief, Cuebiq's CEO's representations were knowingly false. Cuebiq's CEO's public statements demonstrate that, as CEO, he had in-depth knowledge of the technology used by Cuebiq and the corporate relationship of Cuebiq and Beintoo. Cuebiq's false assurances could not have been inadvertent given the knowledge he possessed concerning the business of Cuebiq and Beintoo.

174.    On information and belief, it was Cuebiq's CEO's intent for Gimbal to rely on these misrepresentations and not further investigate Beintoo's and Cuebiq's use of the Gimbal Technology and derivatives of the Gimbal Technology.

175.    On information and belief, it was Cuebiq's CEO's intent for Gimbal to rely on these misrepresentations and not further investigate the relationship between Beintoo and Cuebiq.

176.    On information and belief, it was Cuebiq's CEO's intent for Gimbal to rely on these misrepresentations and not further investigate the fees owed under the License Agreement by Beintoo and Cuebiq.

177.    Gimbal relied on Cuebiq's CEO's assurances to its detriment. Gimbal and Cuebiq had a cooperative relationship in which Gimbal was justified in relying on Cuebiq's representations.

178.    Had Cuebiq not mislead Gimbal, Gimbal would have known that Cuebiq and Beintoo are the same legal entity and that Cuebiq had misappropriated Gimbal's trade secrets, used licensed Gimbal technology or derivatives of the Gimbal Technology, breached the License Agreement, and failed to pay fees under the License Agreement.

179.    Gimbal seeks monetary damages and all other relief available.

180.    Cuebiq's repeated misrepresentations prevented Gimbal from discovering the information necessary to bring this cause of action at an earlier time.

## PRAYER FOR RELIEF

WHEREFORE, Gimbal prays that this Court enters judgment and:

A. Find that Cuebiq breached the License Agreement, and award all relief available under the law;

B. Find that Cuebiq misappropriated Gimbal's trade secrets, and award all relief available under the law;

C. Preliminarily and permanently enjoin Cuebiq, its officers, agents, shareholders, principals, directors, licensees, employees, affiliates, subsidiaries, parents, successors, and assigns from taking any action constituting or assisting in the misappropriation of Gimbal's trade secrets;

D. Award Gimbal its attorneys' fees and costs;

E. Award Gimbal pre-judgment and post-judgment interest; and

F. Grant Gimbal such other and further relief as the Court may deem just and proper under the circumstances.

1

## <u>JURY DEMAND</u>

2

Gimbal demands a jury trial on all issues so triable.

3

4

Dated: February 21, 2023                         FISH & RICHARDSON P.C.

5

6

By:  */s/ Rodeen Talebi*

7

**COUNSEL FOR PLAINTIFFS**

8

**PAEDAE, INC. d/b/a GIMBAL,**
**GIMBAL, INC.**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28